UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


ADAM P. CLERMONT, ESQUIRE      )
    Plaintiff/                )
    Defendant-in-Counterclaim )
                     )
          v.               )
                     )
CONTINENTAL CASUALTY CO.        )    C.A. No. 10-cv-10595-MAP
    Defendant/                )
    Plaintiff-in-Counterclaim )
                     )
          v.               )
                     )
FREEDMAN, DEROSA & RONDEAU      )
LLP                            )


REVISED MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT, AND
DEFENDANT'S MOTION TO STRIKE[1]
(Dkt. Nos. 29, 33, & 40)

March 29, 2011

PONSOR, D.J.

## I.   INTRODUCTION

This case arises out of a fee dispute between

Plaintiff, Attorney Adam Clermont, and his former employer,

---

[1] The court has issued this revised memorandum to
clarify two potentially confusing oversights in the original
text.  See n.4 & n.7 below.

law firm Freedman, DeRosa & Rondeau, LLP ("FDR").[2]  In

February 2010, FDR sued Plaintiff for fees collected from

clients whom Plaintiff continued to represent after leaving

FDR.  Plaintiff now seeks indemnity from his legal

malpractice insurer, Defendant Continental Casualty Company,

which agreed to cover claims made "by reason of an act or

omission in the performance of legal services by the

insured." (Dkt. No. 33, Ex. 27.)  Plaintiff filed a three-

count complaint for declaratory judgment (Count I), breach

of contract (Count II), and violation of Mass. Gen. Laws ch.

93A (Count III).  Defendant filed a counterclaim seeking

declaratory judgment.

    Presently before this court are Defendant's Motion for

Summary Judgment (Dkt. No. 29) and Plaintiff's Cross Motion

for Summary Judgment (Dkt. No. 33).  For the reasons stated

below, Defendant's motion will be allowed and Plaintiff's

motion will be denied.  Defendant's Motion to Strike (Dkt.

No. 40) will be denied as moot.

## II.  BACKGROUND

---

    [2] By agreement of the parties, Freedman, Derosa &
Rondeau LLP was removed from the case on October 20, 2010.

A.    <u>The Fee Dispute</u>.

In the summer of 2009, Plaintiff left FDR in order to establish his own law practice.  Plaintiff specialized in personal injury law while associated with FDR and took a number of personal injury cases with him to his new law office, including a substantial personal injury case captioned <u>Peckham v. Collins</u>, Berkshire Superior Court C.A. No. 09-00153 (the "<u>Peckham</u> action").[3]  In February 2010, the parties to the <u>Peckham</u> action agreed to a settlement in the amount of $2,635,000.  A written settlement agreement executed by the parties and dated February 12, 2010, provided that the insurer for the defendant, Arbella Mutual Insurance Company ("Arbella"), was to pay roughly $866,000 in contingency legal fees to Plaintiff.  Plaintiff had arranged for some of the payments to be structured into an annuity that would provide him with monthly income over the next twenty years.

Upon learning of the settlement, FDR filed suit against Plaintiff in Norfolk Superior Court (the "Norfolk Action")

_____

[3]    The <u>Peckham</u> action involved an automobile accident on January 4, 2008, which resulted in severe personal injuries to the plaintiff, Thomas Peckham.

3

alleging that it was entitled to a share of the contingency fee earned in the <u>Peckham</u> action as well as in other cases that Plaintiff took with him when he left the firm.  FDR asserted that Plaintiff had failed to keep FDR apprised of the status of these cases and had settled several of them without paying any portion of the contingency fee owed to FDR.  Based on these allegations, FDR set forth claims for, <u>inter alia</u>, breach of fiduciary duty, conversion, and unjust enrichment.  FDR also sought a temporary restraining order preventing the disbursement of any contingency legal fees in the <u>Peckham</u> action, which the Superior Court issued on February 23, 2010.

In addition to the Norfolk Action, FDR also filed a notice of attorney's lien in the underlying <u>Peckham</u> action (the "<u>Peckham</u> Lien") and in several other personal injury actions that Plaintiff took with him when he left the firm. Plaintiff filed counterclaims in the Norfolk Action seeking recovery against FDR and also filed his own lawsuit against FDR in Berkshire Superior Court (the "Berkshire Action").  A few days later, Plaintiff sought coverage for the Norfolk Action and the <u>Peckham</u> Lien under a professional liability

insurance policy he had purchased from Defendant.

B.   The Professional Liability Insurance Policy.

Defendant issued Lawyer's Professional Liability Policy
No. 287417376 (the "Policy") to the Law Office of Adam P.
Clermont, Esquire, covering August 1, 2009, through August
1, 2010.  The Policy contains an insuring agreement that
provides that:

> A. COVERAGE
>     The Company agrees to pay on behalf of the Insured
>     all sums in excess of the deductible that the
>     Insured shall become legally obligated to pay as
>     damages and claim expenses because of a claim that
>     is both first made against the Insured and
>     reported in writing to the Company during the
>     policy period by reason of an act or omission in
>     the performance of legal services by the Insured
>     or by any person for whom the Insured is legally
>     liable.

(Dkt. No. 33, Ex. 27 (emphasis in original).)[4]

The term "Claim" is defined under Section III.C of the
Policy to include:

> a demand, including the service of suit or the
> institution of any alternative dispute resolution

---

[4] In its original memorandum and order (Dkt. No. 44),
the court cited the Policy as docket number 5, exhibit 4,
which, in fact, was meant to refer to docket number 5,
attachment 4, exhibit 1.  For ease of reference, the court
has replaced this citation (throughout the memorandum) with
docket number 33, exhibit 27, which also contains the Policy
at issue here.

proceeding, received by the <u>Insured</u> for money or
services arising out of: (1) an act or omission, .
. . in the rendering of or failure to render <u>legal
services</u>; . . .

(<u>Id.</u> (emphasis in original).)

The term "Legal Services" is defined in Section

III.K.1. to encompass "those services, including pro bono

services, performed by an <u>Insured</u> for others as a lawyer,

arbitrator, mediator, other neutral fact finder, as a notary

public or as a title agent . . . ." (<u>Id.</u> (emphasis in

original).)

The term "Damages" is defined under Section III.F as

follows:

> F. "<u>Damages</u>" mean judgments, awards and
> settlements, provided any settlements are
> negotiated with the assistance and approval of
> the <u>Company</u>. <u>Damages</u> do not include:
>
> > 1. legal fees, costs and expenses paid or
> > incurred or charged by the <u>Insured</u>, no matter
> > whether claimed as restitution of specific
> > funds, forfeiture, financial loss, set-off or
> > otherwise, and injuries that are a consequence
> > of any of the foregoing;
> >
> > . . . .
> >
> > 3. injunctive or declaratory relief.

(<u>Id.</u> (emphasis in original).)

C.   <u>Defendant's Response to Request for Coverage</u>.

6

After receiving Plaintiff's request, Defendant informed Plaintiff that it would not defend him because the Policy did not cover his ongoing dispute with FDR.  Defendant then issued a written denial of coverage on March 9, 2010.

That same day, Plaintiff retained Attorney Mark Albano to represent him in the Norfolk Action.  Attorney Albano appeared in Norfolk Superior Court on Plaintiff's behalf to challenge FDR's efforts to extend the temporary restraining order into a preliminary injunction.  He also represented Plaintiff at a telephonic Rule 16 conference held by the court in the Peckham action on March 19, with respect to FDR's request for a second preliminary injunction. Notwithstanding Attorney Albano's efforts, the Superior Court granted the injunctive relief sought by FDR.

After sending several letters disputing Defendant's denial of coverage, Plaintiff filed this suit against Defendant in Berkshire Superior Court on March 17, 2010. Later that day, Defendant reconsidered its earlier denial and stated that it would provide Plaintiff with a defense in the Norfolk Action.  Defendant informed Plaintiff on March 26 that it anticipated the defense would be subject to a

reservation of rights, and, on March 30, Defendant sent
Plaintiff a written notice formally reserving its rights.

After agreeing to defend Plaintiff, Defendant hired
Attorney Jeffrey McCormick to conduct the litigation on
Plaintiff's behalf.  However, after issues arose regarding
the scope of his representation, Plaintiff indicated that he
would prefer to be represented by independent counsel of his
choosing.[5]

Plaintiff later notified Defendant that he wanted to be
represented by Attorney William Worth and directed Defendant
to discuss a fee arrangement with him.  By letter dated
April 16, 2010, Defendant reaffirmed its view that it owed
Plaintiff neither coverage nor defense, but that it would
agree to pay Attorney Worth to defend against FDR's claims
in the Norfolk Action only.

Defendant reiterated that it would not provide a
defense for the other legal disputes with FDR, and proposed
that Attorney Worth's fees be segregated accordingly.  When

_____

[5] As discussed in greater detail below, Plaintiff
alleges that Attorney McCormick's defense was inadequate;
that Attorney McCormick revealed confidential information to
Defendant, which never intended to indemnify him, and that
these events ultimately undercut his ability to defend
himself against FDR.

it became clear that segregating Attorney Worth's fees in such a way would prove difficult or impossible, he and Defendant agreed that Defendant would pay for fifty percent of <u>all</u> work performed on Plaintiff's behalf at a rate of $300 per hour.

    D.   <u>Arbitration</u>.

On April 16, Plaintiff also retained Attorney Robert M. Fuster to represent him in his other legal disputes with FDR. Ten days later, Attorney Fuster appeared in the Berkshire County Superior Court for a hearing and represented to the court that Plaintiff and FDR had agreed to submit their claims to binding arbitration. On May 26, Plaintiff and FDR executed a written agreement to arbitrate.

On June 11, retired Superior Court Justice Allan van Gestel presided over the hearing, and one month later he issued a decision awarding FDR fifty percent of the $866,666.66 contingency fee in the <u>Peckham</u> action ($433,333.33) and denying Plaintiff any relief on his claims against FDR. Among other things, the arbitrator found that Plaintiff had failed to honor a promise to share with FDR on a fifty-fifty basis any contingency fees in excess of

$50,000 that he earned on cases that he took with him when he left the firm. Although Arbella has already satisfied the award in favor of FDR in full with the contingency fees it was holding from the Peckham action, Plaintiff demands that Defendant indemnify him with respect to the award.

E.    Payment of Legal Fees.

To this date, Defendant has paid one half of Attorney Worth's legal fees as well as one half of the expenses associated with his representation of Plaintiff in all of the disputes with FDR, pursuant to the agreement described above. Defendant has also paid the legal fees submitted by Plaintiff's personal counsel, Attorney Albano, for defending Plaintiff during the early stages of the matter.[6]  However, Defendant has refused to indemnify Plaintiff with respect to the $433,333.33 award in favor of FDR.

### III.    DISCUSSION

A.    Legal Standard.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is

---

[6] Defendant reduced Attorney Albano's fees by $2,500 based on the amount of the deductible, for which Plaintiff would have been responsible had coverage been available.

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court views the evidence in the light most favorable to the non-moving party, and the moving party bears the burden of establishing the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).  This standard is not changed when the parties bring cross motions for summary judgment; each nonmovant receives the benefit of favorable inferences.  <u>See</u> <u>Estate of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010).

B. <u>Denial of Coverage</u>.

1. <u>The Coverage Provision</u>.

Plaintiff asserts that Section I.A of the Policy, which covers claims made "by reason of an act or omission in the performance of <u>legal services</u> by the <u>Insured</u>," applies to the underlying actions brought against Plaintiff by FDR.[7] (Dkt. No. 33, Ex. 27 (emphasis in original).)  This court

---

[7] In its original memorandum and order (Dkt. No. 44), the court recited the Policy's definition of "claim," which, under Section III.C, refers to a demand for money "arising out of: (1) an act or omission, . . . in the rendering of or failure to render <u>legal services</u>."  (Dkt. No. 33, Ex. 27.) For the sake of consistency, the court has replaced this provision with the Policy's coverage provision under Section I.A, which contains slightly different phrasing, as noted in text.  The apparent incongruity between these provisions does not alter the court's analysis or its rulings.

disagrees.

The closest Massachusetts case on point is <u>Reliance</u>
<u>National Insurance Company v. Sears, Roebuck and Company</u>,
792 N.E.2d 145 (Mass. App. Ct. 2003) ("<u>Reliance</u>").  In
<u>Reliance</u>, Sears, a former client of Attorney Daniel W.
Goldstone, sought to recover compensation for fraudulent
billing practices by Goldstone.  Attorney Goldstone carried
a legal malpractice policy with Reliance National Insurance
Company, which covered claims "aris[ing] out of the
rendering or failure to render professional services for
others in the insured's capacity as a lawyer."  <u>Id.</u> at 147.
First, the appeals court identified "markers" for
professional services, including "specialized knowledge and
skill that is acquired through rigorous intellectual
training."  <u>Id.</u>  Noting that "courses in billing clients [do
not] appear in law school curricula" and "the billing
function is largely ministerial," the appeals court found
for the insurance company, Reliance, holding that "the
billing function of a lawyer is not a professional service."
<u>Id.</u> at 148.

The First Circuit, interpreting Massachusetts law, has

12

expressed a similar understanding of "professional

services."  In <u>Medical Records Associations, Inc. v.</u>

<u>American Empire Surplus Lines Insurance Co.</u>, 142 F.3d 512

(1st Cir. 1998), the court held that an insurance policy

covering "professional services" rendered by a medical

records processing company did not cover an action for

overbilling.  The court explained its decision as follows:

> [T]he bottom line . . . is that "professional
> services" . . . embrace those activities that
> distinguish a particular occupation from other
> occupations -- as evidenced by the need for
> specialized learning or training -- and from the
> ordinary activities of life and business.

<u>Id.</u> at 516.  <u>See also</u> <u>Massamount Ins. Agency, Inc. v. Utica</u>

<u>Mut. Ins. Co.</u>, 489 F.3d 71, 73 (1st Cir. 2007) (holding that

insured's diversion of business in breach of exclusivity

agreement was a business decision, not a professional

service).

Here, to begin with, the Policy defines "legal

services" as "those services, including pro bono services,

performed by an Insured for others as a lawyer, arbitrator,

mediator, as well as a notary public, or as a title agent."

(Dkt. No. 33, Ex. 27.)  This definition, apart from its

focus on a lawyer's activities, is not substantively

13

different from the definitions for "professional services" set out in the case law. The critical issue, then, is whether the underlying complaint brought by FDR to recover legal fees from Plaintiff was based on an act or omission involving "specialized knowledge and skill that is acquired through rigorous intellectual training," rather than a business decision or some ministerial aspect of Plaintiff's work. Reliance, 792 N.E.2d at 147.

While Reliance does not squarely address this issue, its rationale for excluding billing practices from coverage ("courses in billing clients [do not] appear in law school curricula" and "the billing function is largely ministerial") applies with equal force to a fee dispute with a former employer. The underlying cause of action here was not based on a wrongful act or omission in the provision of legal services; it was based on a wrongful act or omission in the operation of a business that happened to provide legal services.

Plaintiff contends that FDR's complaint "challenged [Plaintiff's] decisions regarding litigation strategy," specifically his failure to send joint letters to certain

14

clients informing them of their rights; choosing to
structure the Peckham settlement; and choosing not to settle
the case prior to filing a lawsuit.  (Dkt. No. 35, Pl.'s
Mem. Supp. at 8.)  However, as Defendant correctly points
out, the complaint ultimately sought relief as a result of
the following three actions: "(I) pirating cases from FDR;
(ii) failing to apprise FDR of the status of his work,
and/or settlement, on his cases, including the Peckham case;
(iii) settling several cases without paying any portion of
the fee to FDR."  (Dkt. No. 5, Ex. 4, FDR Am. Compl. ¶ 32.)
Although FDR's complaint made various allegations of
misconduct by Plaintiff, it sought relief, at its core, for
the alleged violation of a fee-sharing arrangement with a
former employer, which is part of "the billing function of a
lawyer . . . not a professional service."  Reliance, 792
N.E.2d at 148.

       The parties also note that a split of authority exists
among other jurisdictions.  Defendant, of course, relies on
cases in which state courts have found that legal
malpractice insurance policies do not cover an attorney's

fee-sharing arrangements.[8]  Plaintiff cites three cases in

other jurisdictions that reached the opposite conclusion.[9]

---

[8] See, e.g., Continental Cas. Co. v. Donald T.
Bertucci, Ltd., 926 N.E.2d 833, 844 (Ill. App. 2010) (policy
covering "an act or omission . . . in the rendering of or
failure to render legal services" did not apply to "fee
arrangements and other business disputes"); Garland, Samuel
& Loeb P.C. v. Am. Safety Ins. Co., 651 S.E.2d 177 (Ga. App.
2007) (policy covering an "act, error, omission, or Personal
Injury resulting from the performance of Professional
Services" did not apply to alleged breach of fee-sharing
agreement); Roberts v. Florida Lawyers Mut. Ins. Co., 839
So.2d 843, 845 (Fla. App. Ct. 2003) (policy covering "act,
error or omission in Professional Services provided" did not
apply to law partners' "dispute over how to divide money
received from a lawsuit"); Cohen v. Empire Casualty Co., 771
P.2d 29, 31 (Colo. App. Ct. 1989) (policy covering "acts or
omissions in rendering or failing to render professional
services for others in his capacity as a lawyer" did not
apply to fees owed by insured attorney to another attorney
for help in assisting insured attorney's client).

[9] See Continental Cas. Co. v. Cole, 809 F.2d 891, 896
(D.C. Cir. 1989) (policy covering "damages arising from the
performance of professional services for others in the
insured's capacity as a lawyer" applied to damages incurred
by insured law firm in connection with a fee-sharing
arrangement with referring attorney); Lyons v. Am. Home
Assur. Co., 354 N.W.2d 892, 895 (Minn. Ct. App. 1984)
(policy covering claims "arising from the performance of
professional services for others in the insured's capacity
as a lawyer" applied to expenses incurred by insured
attorney in connection with a fee-sharing dispute with
former law partners); Home Ins. Co. v. Bullard, 1988 WL
71192, 850 F.2d 692 (6th Cir. 1988) (Table) (policy covering
"any act, error or omission in professional services
rendered . . . arising out of the conduct of the insured's
profession as a lawyer" applied to expenses incurred by
insured attorney in connection with a fee-sharing dispute
with former employer).

16

Significantly, two of the three cases relied on by Plaintiff (<u>Cole</u> and <u>Lyons</u>) were distinguished by the First Circuit in <u>Medical Records Associations, Inc. v. American Empire Surplus Lines Insurance Co.</u>, 142 F.3d 512, 516 (1st Cir. 1998).  There, the First Circuit found it significant that the policy only covered harms that occurred "by reason of" particular acts by the insured, rather than "arising out of" such acts.  The court distinguished these phrases in the following way:

> The latter arguably requires a determination that the harm alleged was due to the manner in which professional services were provided; the former appears to require only a connection between the challenged conduct and the insured's provision of professional services.

<u>Id.</u> at 516 n.4.  <u>See also</u> <u>New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co.</u>, 667 N.E.2d 295, 298 (Mass. 1996) ("The usual meaning ascribed to the phrase 'arising out of' is much broader than 'caused by' . . . .").  Because both <u>Cole</u> and <u>Lyons</u> used the broader "arising out of" language, the First Circuit found those cases to be easily distinguishable.  The same is true here.

In sum, because the harms alleged in the underlying

17

dispute occurred by reason of a business decision by
Plaintiff and not the provision of legal services, this
court holds that the Policy did not cover the underlying
actions by FDR against Plaintiff.

    2.   <u>The Damages Provision</u>.

    Defendant also argues that the Policy's damages
provision excludes the underlying action from coverage.  The
Policy covers claims for "damages," which, according to
Section III.F of the Policy, <u>excludes</u> "(1) legal fees, costs
and expenses paid or incurred or charged by the Insured, no
matter whether claimed as restitution of specific funds,
forfeiture, financial loss, set-off or otherwise, and
injuries that are a consequence of any of the foregoing" as
well as "(3) injunctive or declaratory relief."  (Dkt. No.
33, Ex. 27.)  Because the underlying action involves a
dispute over legal fees and the Policy expressly excludes
"legal fees" from coverage, Defendant argues that Plaintiff
is unable to seek indemnity for his losses.

    In support, Defendant relies on three state court cases
that stand for this proposition.  <u>See</u> <u>Continental Cas. Co.</u>
<u>v. Donald T. Bertucci, Ltd.</u>, 926 N.E.2d 833, 844 (Ill. App.

2010) (policy did not cover suit by client against insured
for taking excessive fee in breach of fee agreement where
damages provision excluded, <u>inter alia</u>, "legal fees, costs
and expenses paid or incurred or charged by the Insured, no
matter whether claimed as restitution of specific funds,
forfeiture, financial loss, set-off or otherwise, and
injuries that are a consequence of any of the foregoing");
<u>Tana v. Prof. Prototype I Ins. Co.</u>, 55 Cal. Rptr. 2d 160
(Cal. Ct. App. 1996) (policy did not cover suit by client
against insured attorney for retaining excessive amount of
attorney's fees where damages provision excluded, <u>inter
alia</u>, "legal fees, costs, and expenses"); <u>Continental
Casualty Co. v. Brady</u>, 907 P.2d 807, 811 (Idaho 1995)
(policy did not cover suit by client against insured for
taking unreasonably high fee in breach of fee agreement
where damages provision excluded, <u>inter alia</u>, "any fine,
penalty, or claim for return of fees").

Plaintiff cites two cases in response, both of which
are clearly inapposite. <u>See</u> <u>Continental Cas. Co. v. Law
Offices of Melvin James Kaplan</u>, 801 N.E.2d 992 (Ill. App.
Ct. 2003) (holding that damages provision did not exclude

claim for damages arising from bankruptcy attorney's alleged
negligent failure to secure discharge of former client's
pre-petition obligation to pay attorney's fees because the
injury suffered was a consequence of attorney's negligent
representation of client); <u>Continental Cas. Co. v. Feingerts
& Kelly, APLC</u>, 2005 WL 1170440, 132 Fed. Appx. 14, 18 (5th
Cir. 2005) (holding that "majority of [plaintiff's] claims .
. . are excluded from coverage under the Policy because
those claims seek damages for legal fees" but also holding
that one claim was not unambiguously excluded where former
client alleged that attorney failed to apprise her of
settlement proceedings).

Here, as in the cases Defendant cites above, the
underlying action "is a fee dispute and does not allege
'damages' within the meaning of the policy." <u>Donald T.
Bertucci, Ltd.</u>, 926 N.E.2d at 844. Thus, because the
damages provision expressly excluded actions to recover
legal fees, Defendant enjoys a strong independent basis for
summary judgment.

C. <u>Estoppel</u>.

Plaintiff argues that Defendant is estopped from

20

denying coverage after representing to Plaintiff that it would cover his claims. This argument is unpersuasive.

In Massachusetts, a liability insurer, "'having led the assured to rely exclusively on its protection during the period when he might have protected himself . . . cannot, in fairness, thereafter withdraw that protection.'" Specialty Nat. Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 735 (1st Cir. 2007) (quoting Salonen v. Paanenen, 71 N.E.2d 227, 230 (Mass. App. Ct. 1947)) (hereinafter "Specialty"). The familiar legal principle of estoppel governs such situations. Id.

> [T]o become estopped from denying coverage under a
> liability insurance policy, an insurer must say or
> do something intended to induce conduct on the
> part of its insured; the insured must act or
> refrain from acting in reasonable reliance on the
> insurer's representation; and the insured must
> suffer some detriment as a result.

Id. Estoppel often turns on determinations of fact, but where the relevant facts are established, the court may treat the issue as a question of law. Id.

In Specialty, where there was "no suggestion, let alone any evidence, that [the insurer] mishandled [the insured's] defense," the First Circuit held that estoppel did not

apply.  Id. at 736.  The court expressly distinguished
Safety Insurance Co. v. Day, 836 N.E.2d 339, 347 (Mass. App.
Ct. 2005), which held that estoppel applied where the
insurance company ignored opportunities to settle the case
and inadvertently disclosed confidential documents
discussing litigation strategy to opposing counsel.

Here, Plaintiff argues that Defendant mishandled his
defense in several ways: 1) Defendant hired Attorney
McCormick who failed to seek recusal of the Superior Court
judge in the Peckham action due to a conflict of interest,
resulting in a continuation of the injunction; 2) Defendant
improperly obtained confidential information from Attorney
McCormick; and 3) Defendant interfered with Plaintiff's
ability to retain independent counsel and "forced" Plaintiff
into arbitration with FDR due to his inability to handle the
costs of litigation himself.

As a preliminary matter, Plaintiff fails to appreciate
a critical distinction between this case and the cases cited
above: here, Defendant informed Plaintiff that it was
disputing coverage and that its defense would be subject to
a reservation of rights less than two weeks after agreeing

to defend Plaintiff.[10]  In contrast, the insurance company in Specialty controlled the defense of the plaintiff's claims for over two years without asserting that those claims were excluded from coverage.  486 F.3d at 735. Notably, the court held that estoppel did not apply even in spite of this delay.  Id.

In addition, Plaintiff's criticisms regarding the handling of his defense are unfounded.  The court can dispatch the first two contentions fairly easily.  As to the first argument, Plaintiff cannot prove any link, let alone a causal link, between Attorney McCormick's alleged failure to seek recusal of the Superior Court judge and any unfavorable ruling he received in that case.  Moreover, Plaintiff's interests were doubly protected at that time, as he was also represented by his own personal counsel, Attorney Albano.

Similarly, Plaintiff's contention that Attorney McCormick revealed confidential information that somehow infected the ongoing litigation rests on pure speculation. Attorney McCormick was actively involved in the case for

_____

[10] On March 17, 2010, Defendant informed Plaintiff that it would defend him, and, on March 30, Defendant confirmed that this defense would be subject to a reservation of rights.

less than two weeks, between March 18 and March 29, and

Plaintiff has not pointed to any specific action taken by

Attorney McCormick that in <u>any</u> way prejudiced his defense.

Plaintiff's third argument requires a bit more

attention, largely because of the dense fact pattern that

developed between March and April of 2010.  It is undisputed

that Defendant informed Plaintiff on March 26, 2010, that it

anticipated its defense would be under a reservation of

rights, and, four days later, on March 30, Defendant issued

Plaintiff a written confirmation of the latter.  However,

Plaintiff argues that Defendant "again refused to

acknowledge that [Plaintiff] was entitled to retain

independent counsel" and informed Plaintiff that it was

"willing to consider [Plaintiff's] choice of independent

counsel contingent on the attorney meeting the policy

requirements set forth in Section I.B. of the policy."[11]

(Dkt. No. 34, Pl.'s Mem. Opp'n at 13.)  Plaintiff argues

that this uncertainty, combined with Attorney McCormick's

"abrupt departure" on March 29, "further prejudiced

---

[11] Section I.B of the Policy provides that the insured
is entitled to select independent counsel in the event that
the insurer reserves its rights on grounds that create a
conflict of interest.  (Dkt. No. 33, Ex. 27.)

[Plaintiff's] efforts to mount a cohesive defense." (Id. at 15.) Plaintiff concludes that he was "left without a defense and, ultimately, forced into [arbitration] with FDR." (Dkt. No. 35, Pl.'s Mem. Supp. at 2.) The undisputed facts, however, conclusively indicate otherwise.

Shortly after notifying Plaintiff that it would defend him, Defendant retained Attorney McCormick, who competently represented Plaintiff's interests until Plaintiff abruptly ended the relationship, deciding to seek out counsel of his own choosing. Even if Defendant's discussions about compensating Plaintiff's newly retained attorney (Attorney Worth) created uncertainty, Plaintiff has failed to offer any evidence that this alleged uncertainty had any impact the outcome of the case. Defendant notified Plaintiff on April 16 that it would compensate Attorney Worth for his services. Around this time, Plaintiff also retained Attorney Fuster to defend him in some of the FDR-related proceedings. On April 26, Attorney Fuster represented to the Berkshire County Superior Court that Plaintiff agreed to submit his dispute with FDR to binding arbitration, and the parties executed a written agreement to arbitrate one month

later.  Plaintiff has not produced any evidence that would allow a reasonable jury to conclude that this arbitration agreement was anything other than the product of a thoughtful and strategic decision reached with the advice of counsel.

Plaintiff relies primarily on a statement by Attorney Worth that "[o]n or about April 22, 2010, [Plaintiff] informed me that he could no longer afford to litigate his dispute with FDR as Continental had abandoned his defense," (Dkt. No 40, Ex. A, Worth Aff. ¶ 12), but this statement is problematic for two reasons.  First, the statement contains inadmissible hearsay, which the court may not consider in deciding a motion for summary judgment.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence . . . .").  Second, even assuming that Plaintiff subjectively believed that Defendant "had abandoned his defense" on April 22, which is doubtful, this subjective concern is belied by the objective facts.  Defendant, far from "abandoning" Plaintiff, had both provided counsel to defend Plaintiff

(Attorney McCormick) and had confirmed that it would compensate Plaintiff's choice of counsel (Attorney Worth). The test, of course, is an objective one, see <u>Specialty</u>, 486 F.3d at 735, and it was not objectively reasonable for Plaintiff to conclude that Defendant had abandoned his defense given what had occurred to that date.

Furthermore, Plaintiff's suggestion that litigation would have produced a better result for him than arbitration is wholly speculative. Considering the result of the arbitration, Plaintiff apparently now wishes, in hindsight, that he had chosen a different path. It is possible that, had he taken the case to trial, he would have won. It is equally possible that he would have fared much worse. Such unfounded conjecture adds nothing to Plaintiff's argument. Plaintiff simply cannot demonstrate that his interests were prejudiced by his decision to proceed with arbitration.

In sum, given that Defendant issued a reservation of rights within two weeks of agreeing to defend Plaintiff and did nothing to prejudice Plaintiff's defense, estoppel does not apply.

D.   <u>Duty to Defend</u>.

Plaintiff also argues that, in addition to wrongfully denying coverage, Defendant failed to defend Plaintiff in the underlying action by FDR. This argument cannot hold water. Defendant had no duty to defend Plaintiff, and, even if it did, Defendant fulfilled that duty.

"It is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify." <u>Boston Symphony Orchestra v. Commercial Union Ins. Co.</u>, 545 N.E.2d 1156, 1158 (Mass. 1989). The duty to defend is determined by reference to the allegations in the complaint and "facts known or readily knowable" by the insurer. <u>Billings v. Commerce Ins. Co.</u>, 936 N.E.2d 408, 414 (Mass. 2010). For the duty to arise, the insured need only show that the allegations in the complaint are "reasonably susceptible of an interpretation that they state . . . a claim covered by the policy terms." <u>Id.</u> at 414 n.6 (citations and quotation marks omitted). "However, when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant." <u>Id.</u> (citations and quotation marks omitted).

As explained above, the complaint filed by FDR clearly
sought damages and injunctive relief arising from a fee
dispute between Plaintiff and his former employer, not from
inadequate legal services provided to a client.  The
allegations in that complaint are not reasonably susceptible
of a contrary interpretation but rather "lie expressly
outside the police coverage and its purpose."  Id.  Thus,
Defendant had no duty to defend Plaintiff.

Furthermore, even if Defendant had had a duty to defend
Plaintiff, it fulfilled that duty.  As noted, shortly after
Plaintiff retained Attorney Worth, Defendant agreed to pay
Attorney Worth at a rate of $300 per hour for all services
rendered with respect to the Norfolk action.  However, given
the apparent difficulty in segregating charges for the
Norfolk Action from the various other disputes with FDR in
which Attorney Worth was representing Plaintiff, Defendant
agreed to reimburse fifty percent of all fees charged by
Attorney Worth for his representation of Plaintiff.  (Dkt.
No. 41, Ex. O.)  This agreed arrangement was entirely
reasonable, and Plaintiff does not dispute that Defendant
compensated Attorney Worth accordingly.  Thus, even assuming

*arguendo* that Defendant had a duty to defend Plaintiff,
Defendant fully satisfied its obligations.

E.    Chapter 93A.

Given that Plaintiff has provided no independent basis
for its Chapter 93A claim, the court will grant summary
judgment for Defendant on this count as well.  See Boston
Symphony Orchestra, 545 N.E.2d at 1160 (upholding summary
judgment for defendant insurance company on 93A claim even
in spite of its conclusion that defendant had incorrectly
interpreted the policy).

F.    Defendant's Motion to Strike (Dkt. No. 40).

Defendant has moved to strike various statements made
by Plaintiff in his opposition to Defendant's motion for
summary judgment.  (Dkt. No. 40).  Given the above ruling on
the motions for summary judgment, the court will deny
Defendant's motion to strike as moot.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for
Summary Judgment (Dkt. No. 29) is hereby ALLOWED and
Plaintiff's Cross Motion for Summary Judgment (Dkt. No. 33)
is hereby DENIED.  Defendant's Motion to Strike (Dkt. No.

40) is hereby DENIED AS MOOT.  The clerk will enter judgment

for Defendant.  The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge